Filed 10/28/15  P. v. Golden CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B257243 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA084649) |
| v. | |
| VICTOR MARCELLOUS GOLDEN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Mark S. Arnold, Judge.  Affirmed.

Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Michael R. Johnsen and Gary A. Liberman, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Victor Marcellous Golden (defendant) appeals from his rape conviction. He contends that the conviction is unsupported by substantial evidence; that the trial court erred in admitting evidence of the reason why a witness was crying during her testimony; and that defense counsel rendered constitutionally ineffective assistance by failing to object to the court's failure to admonish a witness support person, or to the use of the term "rape kit." As we conclude that defendant's conviction was supported by substantial evidence and that defendant's remaining contentions are without merit, we affirm the judgment.

## BACKGROUND

A four-count information filed against defendant and codefendant Michael Lewis Thomas (Thomas) charged the rape of Ragan Burns (Ragan) while she was prevented from resisting due to intoxication (count 1), in violation of Penal Code section 261, subdivision (a)(3).[1] Defendant was charged in count 2 with the misdemeanor battery upon Dana Burks (Burks), in violation of section 242.[2] Following a jury trial defendant was found guilty of both counts in which he was charged. On May 1, 2014, the trial court sentenced defendant to the low term of three years in prison as to count 1, with a concurrent jail term of six months as to count 2. Defendant was ordered to pay mandatory fines and fees, and was given 340 days of presentence custody credits, which included 296 actual days. Defendant filed a timely notice of appeal from the judgment.

**Prosecution evidence**

At the time of the relevant events, Ragan was 20 years old and Burks was 22 years old. The two had been friends since the sixth grade. After Burks joined the Air Force they got together from time to time when Burks was home for visits. On June 18, 2012, Burks invited Ragan to "hang out" with Thomas and defendant at defendant's home. When the women arrived at about 9:00 p.m., they had not consumed any drugs or

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

[2]    Thomas was charged in counts 3 and 4 with attempted rape and misdemeanor battery. He was not tried with defendant.

2

alcohol.  After awhile the four went to buy vodka and juice.  They then returned to defendant's garage, which was furnished with a sofa, a bed, a minivan seat, a table, and some lighting.  Soon after they arrived, defendant left the garage for about an hour.  Ragan, Burks, and Thomas began playing a drinking game with dice, which required the person throwing the lowest number to take a shot of alcohol.

Burks testified that Ragan had four or five shots and did not appear to be sober when defendant returned.  They continued to play the dice game and Ragan continued to drink, bringing her total to about eight shots.  Throughout the evening, defendant had one or two mixed drinks and a shot or two, but did not appear to be intoxicated, in contrast with Ragan who was very drunk.  Ragan could not sit straight, swayed, and slurred her words.  The game came to an abrupt end when Ragan fell straight back onto the bed.

Defendant then lay down with Ragan, and the lights went out.  After a few minutes Burks said she wanted to go, but Thomas refused because Ragan and defendant were having sex.  When Burks doubted him, Thomas illuminated the bed with his cell phone light, and Burks saw that defendant was naked on top of Ragan, having sex with her as she lay there without underwear and her dress pulled up to her waist.  Ragan's arms were limp, she was not holding defendant, and her legs were not wrapped around him.  During the brief time they were illuminated, Burks thought they were having consensual sex; but when Burks said she was ready to go and heard Ragan say "stop" about three times, she then pushed defendant off her friend, as the lights came on.  When defendant got up and Ragan continued to lie there, Burks realized that Ragan was unconscious and did not know what was happening.  After putting on his underwear, defendant claimed the sex was "consensual" -- that Ragan had wanted it and had been "kissing on him, and stuff like that."

Burks tried to have Ragan get up, but Ragan lay there, not moving.  She would not wake up.  As defendant continued to attempt to justify the situation, Burks managed to get Ragan's arms around Burks's neck, but Ragan remained limp.  Apparently upset when Burks expressed the opinion that the situation was not right and said they were leaving, defendant placed his hands around Burks's neck while Thomas pulled her hair.

3

Ragan fell back onto the bed without any reaction.  Burks got Ragan up again and carried her.  Just before reaching the exit, Burks dropped Ragan onto the minivan seat next to the pedestrian door.  Defendant continued speaking to Burks, saying such things as he would never do anything to hurt or bother Ragan and that she had wanted this.  When Burks looked back at Ragan, Thomas was now naked, on top of her, trying to have sex with her.  Burks placed her hand over Ragan's vagina to stop Thomas from penetrating her, yelled at him, and managed to get Ragan up and outside to the lawn.  Burks then said something to defendant that made him angry.  He punched her in the chest and knocked her to the ground, causing Ragan to fall as well.  While Ragan lay on the ground saying nothing, Burks got into her car.  Instead of locking the door, she unlocked it by mistake, and Thomas got into the car.  Meanwhile defendant picked up Ragan and took her back into the garage.

About midnight Burks called her friend Isaac Black (Black) to come and help her.  Once she was in his car Black offered to go into the garage to get Ragan, but Burks was afraid he would get hurt.  Black suggested calling the police, but Burks was afraid she would be in trouble with the Air Force for buying alcohol for underage drinkers.  The two drove around for awhile until Burks received a text message from defendant asking her to come back for Ragan.  Burks initially refused, but later Black took her there and then drove Burks and Ragan to Ragan's home at about 3:30 a.m.  At the gate, Burks summoned Ragan's father Michael Burns, who came out and took one arm while Burks took the other, and they carried Ragan into the house.  The next morning defendant sent Burks a text message asking her to come and get Ragan's belongings.  Burks thereafter retrieved Ragan's bracelet, jacket, and sandals.

Michael testified that he had never seen Ragan in such a condition; she could not stand up, was unable to speak, and she kept trying to lie down as he and Burks carried her into the house.  He put her into bed about 4:00 a.m., and checked on her hourly.

Ragan testified that she remembered taking four or five straight shots of vodka, and then a sip of Burks's mixed drink.  She could remember nothing more after that until she woke up at home the next day, still wearing the same dress as the night before, but

missing her underwear. When she went to the bathroom, her thighs were sore and she saw bruises, one on her right hip and one on her shoulder, as well as some small scrapes on her knees which had not been there before she went to defendant's house.

Ragan sent Burks a text message asking about her underwear. After Burks responded Ragan called the police, but fell back to sleep before they arrived. Later in the day, after Burks told Ragan what happened the night before, the two of them went to the Sheriff's station and then to the hospital. A medical examination revealed injuries to Ragan's vagina and anus which she did not have prior to the preceding night. Ragan testified that she did not consent to any sexual acts with either defendant or Thomas, that she had never dated either man, had not wanted to have sex with either of them, and that she had no memory of what happened to her between taking a sip of the mixed drink and waking up at home.

Forensic nurse Jennifer Rivera testified that she performed a sexual assault examination of Ragan in the evening of June 19, 2012. Nurse Rivera took a history and photographs, and found "a lot of injury": a tear at base of the vagina; many tears throughout the perineum; and two anal tears. Ragan reported having drunk a lot of vodka, had memory loss, soreness in her thighs, pain in her vagina, and that her friend had told her that she had seen defendant have intercourse with Ragan while she was unconscious. Nurse Rivera concluded that Ragan's injuries were caused by blunt force trauma and found them to be consistent with her history and her friend's account.

Senior criminalist Sara Cohen-Hadria received the sexual assault kit collected by Nurse Rivera, as well as DNA samples from defendant, Thomas and Ragan's clothing. Thomas's DNA was found on Ragan's dress and some parts of her body, but none of defendant's DNA was detected, which is consistent with condom use.

Deputy Sheriff Jerry Neureither assisted investigating officer Detective Charles Braden and other detectives in executing a search warrant on defendant's garage. They recovered the victim's underwear, a nearly empty vodka bottle, a shot glass, and some bedding.

Deputy Neureither was also present when Detective Braden interviewed defendant. A recording of that interview was played for jury. Defendant said he was drunk that night although he took half shots while Ragan drank full shots. He said that sometime before the lights went out, Ragan wanted him to kiss her and she pulled him closer. He claimed she grabbed his penis "and stuff" and took her panties off "or whatever." They were kissing and she kissed him on the neck. Defendant then told her to wait, got a condom from his jacket, put it on, and lay back down on top of her. Defendant told the detectives, "I remember this vividly," and claimed that she grabbed his neck, wrapped her legs around his waist, and they had sex for about three minutes, before the lights went off. Defendant said he was not aware of where Burks and Thomas were at that time, but while defendant and Ragan were having sex, a cell phone light flashed on them and defendant heard whispering and a door slamming. A minute or two later, Burks opened the door and said, "Ragan, I'm leaving. I'm ready to go." Defendant claimed that by that time, he and Ragan had stopped having sex, and Ragan was "unresponsive . . . like just laying there . . . moaning, 'okay, okay,' or whatever." When he heard Burks slam the door again, defendant sent her a text message asking her to come back. Defendant explained: "I only had sex with her the one time. And when [Burks] was bursting in I never -- I didn't even ejaculate . . .'cause . . . it was so much commotion going on like we couldn't really get into like having sex so." Defendant said that the condom did not even have semen on it because they were interrupted by Burks.

**Defense evidence**

Defendant's mother, Sonya Golden, testified that when she drove into her driveway at approximately 10:00 p.m. that night, defendant came out to the car and asked her to take him to the store, which she did. She stayed in the car at the store, and defendant came out after a few minutes with some pink lemonade. They were back home within 10 minutes. She went to her room, unaware that people were in her garage drinking. She thought the laughter she heard came from her daughter and other son.

Defendant testified that he was 21 years old at the time, and had known Ragan for some time but had they never dated. He claimed that in the past, Ragan would do little

6

provocative things like sit in his lap, although there was never a physical attraction between them. He did not think she was "coming on to [him]." He explained, "She would just give me little hints like sitting in my lap, stuff like that." Defendant did not tell this to the detectives because they never asked. Defendant also claimed that his memory of the incident was hazy because he was intoxicated that evening.

Defendant told the detectives he had taken two gulps of his mixed drink before his mother arrived. After he went with his mother to the store, he stayed in the house cleaning the kitchen until she went to sleep. Defendant was seated on the bed next to Ragan during the drinking game, and he thought that Ragan was acting in a provocative manner, "saying little flirty things," like "stop" while "play-hitting" him. Toward the end of the game, she leaned on him, became "real flirtatious and stuff," tried to kiss him, and said, "stop doing that," which he interpreted as an excuse to "sort of touch" him "and stuff like that." Defendant claimed that he stopped playing the drinking game because he was not feeling well, and that when the game stopped, he was "kind of buzzed." Defendant admitted he told the detectives that his mixed drinks were mostly juice, but claimed in his trial testimony that he added more alcohol.

While the lights were on, Thomas and Burks were sitting on the minivan seat about four feet away, where they could see what defendant and Ragan were doing. Defendant was sitting close to the only lamp in the garage, but denied having turned it off. Defendant testified that after the lights went out, Ragan became "really provocative," rubbing her genital area, rubbing him, and kissing him "excessively." Then she said, "[L]et's get started," and although he claimed not to know what that meant, he put on a condom and then "attempted to have sex with her." Defendant claimed Ragan grabbed his neck, pulled him down, and wrapped her legs around him in such a way that he could not position himself correctly to penetrate her. His attempt lasted about three minutes before the cell phone light flashed on them. Defendant explained that in his police interview, when he said he had sex with Ragan for three minutes before being interrupted by Burks, he did not know what constituted sex. He thought that whenever a penis made contact with a vagina, that was sex, but that night he was not sufficiently

7

erect to penetrate her or "to fully penetrate into her." Only the tip -- the head of his penis -- went inside her vagina. The reason he did not give this explanation to the detectives was because he assumed they would know that when he told them he did not ejaculate.

Although defendant knew Ragan had consumed seven shots of alcohol that night and was "feeling her alcohol," he denied knowing that she was intoxicated until after they had intercourse and Ragan fell asleep. Later in his testimony, defendant said he knew Ragan was intoxicated when he took off her underwear, but claimed she was still fully awake. Defendant admitted that he described Ragan as "unresponsive" in his police interview, but explained that what he really meant was that she did not respond to Burks when Burks yelled at her that she leaving. Defendant then testified that Ragan replied, "Okay, okay," when Burks announced her departure. Defendant explained that when he told the detectives that Ragan moaned the words, "Okay, okay," he meant that she groaned as though she were upset about leaving.

Defendant testified that Burks was gone for at least 30 minutes, and when she came back, Ragan was asleep. He and Thomas both suggested that Burks let Ragan sleep, but Burks tried to "snatch her out of the bed and pick her up" while Ragan said, "[S]top, stop, leave me alone. Stop." Drunk and stumbling, Burks carried Ragan out of the garage and dropped her into the bushes. When defendant tried to help pick up Ragan, Burks cursed at him, told him leave her alone, and tried to pull Ragan out of his hands, causing both women to fall on the grass. Defendant denied punching Burks, claiming that he merely pushed Ragan toward Burks when he was holding Ragan saying something like "all right, take her." Burks then quickly walked off with Thomas following her, leaving Ragan lying in the grass with her dress up. Defendant pulled Ragan's dress down, helped her back into the garage, and put her under the covers as Thomas returned to the garage. When Burks came back about 10 minutes later, defendant told her she needed to be responsible and stay with Ragan, because a "DUI" would get her kicked out of the Air Force. Burks insisted on going, so defendant watched Ragan and went to sleep on the couch. When he woke up around 10:00 a.m., no one else was there.

8

**DISCUSSION**

## I. Substantial evidence

### A. *Standard of review*

Defendant contends that his rape conviction is unsupported by substantial evidence.

"The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]  On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" (*People v. Jones* (1990) 51 Cal.3d 294, 314.)  "The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)  "An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 396.)  We do not reweigh the evidence or resolve conflicts in the evidence. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

"[B]ecause 'we *must* begin with the presumption that the evidence . . . *was* sufficient,' it is defendant, as the appellant, who 'bears the burden of convincing us otherwise.' [Citation.]" (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1430.)  Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

### B. *The elements of the offense*

Defendant was convicted of rape, in a violation of section 261, subdivision (a)(3), which is defined as "an act of sexual intercourse accomplished with a person not the spouse of the perpetrator, under . . . the following circumstances:  [¶] . . . [¶] "Where a person is prevented from resisting by any intoxicating or anesthetic substance, or any controlled substance, and this condition was known, or reasonably should have been known by the accused."

Defendant contends that the evidence was insufficient to prove that the victim's level of intoxication prevented her from resisting or consenting, or to prove that he knew or reasonably should have known of her condition. The statutory term, "prevented from resisting," has been interpreted to mean lacking the capacity to give legal consent. (*People v. Giardino* (2000) 82 Cal.App.4th 454, 462 (*Giardino*).) The term, "known, or reasonably should have been known," means actual or constructive knowledge of the level of the victim's intoxication. (*People v. Linwood* (2003) 105 Cal.App.4th 59, 68-72.)

Defendant also challenges what he describes as another element of the offense that the prosecution failed to prove: "(3) that [defendant] did not actually and reasonably believe Ragan was capable of giving consent, even if that belief was wrong." This is not an element of the offense, but a defense. (See *Giardino*, *supra*, 82 Cal.App.4th at p. 472.) We nevertheless discuss each of the issues in turn.

### 1. Legal consent

Defendant contends the evidence was insufficient to prove that the victim was physically incapable of resisting, "had she chosen to do so." Summarizing only the evidence supporting his contention and drawing all inferences in his favor, defendant argues that Ragan was not unconscious, she was able to communicate, and she could not recall whether she said or did anything to communicate her lack of consent. Defendant infers that when Ragan said "stop," she was not speaking to defendant, but rather to Burks, protesting against Burks's intention to leave. Defendant concludes that Ragan's words and actions indicated that she did not physically resist because she consented to sexual intercourse.

Defendant's contentions are without merit and made without reference to relevant authority.[3] Contrary to defendant's suggestion otherwise, "lack of *actual* consent is not

---

[3] Defendant cites CALCRIM No. 1002 as authority for these arguments, although "jury instructions, whether published or not, are not themselves the law, and are not authority to establish legal propositions or precedent." (*People v. Morales* (2001) 25 Cal.4th 34, 48, fn. 7.)

10

an element of the crime." (*Giardino*, *supra*, 82 Cal.App.4th at p. 464, italics added.) Further, the requirement that the victim was "prevented from resisting" due to intoxication does not require proof that the victim was physically unable to resist. Thus it is unnecessary to show that the victim was unconscious or otherwise unable to communicate a refusal. (*Id.* at pp. 462-464, 466.) "[S]ection 261(a)(3) proscribes sexual intercourse with a person who is not capable of giving *legal* consent because of intoxication. . . . [T]he issue is not whether the victim actually consented to sexual intercourse, but whether he or she was capable of exercising the degree of judgment a person must have in order to give legally cognizable consent." (*Giardino*, at p. 462, italics added.) "[T]he statute requires only that the level of intoxication be such that the victim is incapable of exercising the judgment required to decide whether to consent to intercourse." (*Id.* at p. 464.)

In deciding whether the level of the victim's intoxication deprived the victim of the capacity to exercise the degree of judgment a person must have in order to give legally cognizable consent, the jury considers all the circumstances, including the victim's age and maturity. (*Giardino*, *supra*, 82 Cal.App.4th at p. 466.) Here, when viewed in the light most favorable to the judgment, the circumstances provided the jury with substantial evidence of the victim's lack of capacity to exercise the necessary degree of judgment. Even while she was sober, Ragan began the evening displaying immature judgment. She was 20 years old, not yet the age to legally consume alcohol, but nevertheless announced to her companions that she was a master drinker and intended to achieve 10 shots. Ragan began drinking that night after the foursome had purchased the vodka, and shortly before defendant's mother came home at 10:00 p.m. When defendant returned from the kitchen at about 11:00 p.m., Ragan had already taken four or five shots, and then had three or four more. She stopped drinking sometime before midnight, when Burks called Black. Thus, Ragan, whom defendant described as a "skinny girl," had about eight shots of straight vodka in a period of approximately two hours.

Defendant acknowledges Ragan was "most certainly drunk." Burks testified that Ragan was swaying with slurred speech when she fell straight back, hard onto the bed.

11

The light went out, and when it came back on, Burks saw defendant on top of an unmoving, limp Ragan, who was murmuring "stop" as though in a dreamlike state. Even after Burks pushed defendant off Ragan, she lay there, clearly unconscious and unaware of what was happening. Overwhelming evidence demonstrated that Ragan was unconscious, asleep, or at least semiconscious at the time defendant had sexual intercourse with her. Under such circumstances even if defendant's construction of the statute were correct, we conclude that substantial evidence supported the jury's finding that the victim's level of intoxication rendered her physically unable to resist or give actual consent.

## 2. Knowledge

Defendant contends that the prosecution failed to prove that he knew or should have known that the victim's level of intoxication rendered her incapable of consenting or resisting. He argues that the facts known to him "at the time he engaged in physical contact with Ragan would *not* have indicated to [him] that Ragan was so intoxicated she could not resist any physical advances"; and that her physical reactions "would have reasonably led [him] to believe Ragan was not only capable of giving consent, but that she in fact did give consent."

Again, defendant's premise mistakenly assumes that the statute contemplates an incapacity to give actual consent or to physically resist, when in fact, the level of intoxication required is that which renders the victim "incapable of exercising the judgment required to decide whether to consent to intercourse." (*Giardino*, *supra*, 82 Cal.App.4th at p. 464.)

Constructive knowledge will satisfy the knowledge requirement of section 261, subdivision (a)(3). (*People v. Linwood*, *supra*, 105 Cal.App.4th at pp. 68-72.) Contrary to defendant's argument that the evidence must show what facts would support his own reasonable belief in the victim's capacity, constructive knowledge is determined under an objective test using the reasonable person standard. (*Ibid.*) To enable a reasonable person to determine if another no longer has the ability to resist, "[t]here are commonly

12

recognizable indications of a person's intoxication, including an odor of alcohol, slurring of speech and unsteadiness." (*Id.* at p. 70.)

Substantial evidence demonstrated that there were obvious indications of intoxication here. It was apparent that Ragan was very drunk. Burks testified that Ragan had not been sitting straight, she had been swaying, and her words were slurred. Defendant admitted to the detectives that before having sexual intercourse with Ragan he saw that she was intoxicated. Defendant admitted knowing that Ragan had ingested seven or eight full shots of vodka that evening, and that it was too much for Ragan. He told the detectives that during the drinking game, "it got to a point where like -- 'cause you know she's a skinny girl. It got to the point where I was like she -- don't give her anymore. Don't give her anymore. Like that's enough. That's enough." He also told them that while he and Ragan were sitting across from Burks and Thomas, Ragan was "falling on" him, and that he said to her, "[C]ome on. Let's sit up." He continued, "[W]hen I sit her up that's when like I could tell she was inebriated. She's like ooh. And then I'm like oh. I let her lay back down . . . ." Finally, defendant admitted that as soon as Burkes stopped him from having intercourse with Ragan, defendant could see that Ragan was "unresponsive," just lying there, moaning.

We conclude that under these circumstances, a reasonable person would have known that the victim was too intoxicated to exercise the judgment required to give legal consent to sexual intercourse. Further, overwhelming evidence in the form of defendant's own admissions supports a finding that defendant had actual knowledge that Ragan was too intoxicated to exercise the judgment required to give legal consent to sexual intercourse.

### 3. Mistaken belief defense

Defendant contends that there was insufficient evidence to support a finding that he did not believe that Ragan was capable of giving consent or that his belief that she was so capable was unreasonable. Defendant suggests that without evidence of violence or threats of bodily injury the law does not prohibit having sex with someone who was "most certainly drunk," so long as there is "at the very least acquiescence to the physical

13

contact." He argues that the evidence, including his own testimony, shows that he believed Ragan was capable of giving consent and that she actually did give consent. Finally, defendant contends that it was the prosecution's burden to prove otherwise beyond a reasonable doubt, and that the prosecution failed to meet its burden.

As authority for his contentions defendant cites *People v. Williams* (1992) 4 Cal.4th 354, 360, and *People v. Mayberry* (1975) 15 Cal.3d 143, 154-155, which held that an honest and reasonable but erroneously held belief that the victim actually consented to sexual intercourse is a defense to a charge of forcible rape ("*Mayberry* defense"). Neither case involved or discussed the capacity of an intoxicated victim to give legal consent, and as "the actual consent of the victim is not a defense to a charge of rape by intoxication, a belief in the existence of such actual consent is irrelevant." (*Giardino*, *supra*, 82 Cal.App.4th at p. 471.) The *Mayberry* defense is thus inapplicable here.

"It is a reasonable belief in the victim's capacity to consent, not the consent, that provides a defense to rape of an intoxicated person. [Citations.]" (*People v. Braslaw* (2015) 233 Cal.App.4th 1239, 1245.) As respondent points out, the jury in this case was instructed with CALCRIM No. 1002, including the following optional language: "The defendant is not guilty of this crime if he actually and reasonably believed that the woman was capable of consenting to sexual intercourse, even if that belief was wrong. The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the woman was capable of consenting." The record does not disclose why the trial court read this part of the instruction. The court also instructed the jury that to find defendant guilty, the People must prove that "defendant knew or reasonably should have known that the effect of an intoxicating substance prevented the woman from resisting." The two instructions were inconsistent, as "[a] belief that the victim was able to resist could not be reasonable if the perpetrator 'reasonably should have known' that the victim was unable to resist." (*People v. Ramirez* (2006) 143 Cal.App.4th 1512, 1529; see also *People v. Braslaw*, *supra*, at p. 1246.)

14

Thus, any defense based on defendant's reasonable but mistaken belief in the victim's capacity to give legal consent, defendant's belief would have to have been *objectively* reasonable. As we have already determined that substantial evidence supported a finding that a reasonable person would have known that the victim was incapable of giving legal consent, "defendant's subjective belief was beside the point." (*People v. Braslaw*, *supra*, 233 Cal.App.4th at p. 1251.)

## II. Relevance of reason for crying

Defendant contends that Burks's explanation as to why she was crying on the witness stand was not relevant, and the trial court abused its discretion by admitting that explanation. He also contends that the testimony should have been excluded under Evidence Code section 352, and that it was so inflammatory that its admission violated due process.

Respondent contends that defendant has forfeited his claim of error under Evidence Code section 352, as defendant's only objection to the evidence was made on the ground of relevance. An objection on one ground does not preserve an appellate challenge based upon a different ground. (*People v. Partida* (2005) 37 Cal.4th 428, 434-435; Evid. Code, § 353.) A relevance objection thus does not preserve for appeal a claim that the trial court abused its discretion under Evidence Code section 352. (*People v. Alexander* (2010) 49 Cal.4th 846, 905.) "A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*People v. Partida*, *supra*, at p. 435.) Further, as defendant did not object on constitutional grounds, he is limited to a "narrow due process argument" on appeal if he demonstrates that the trial court erred in overruling his relevance objection, and that the error resulted in the additional consequence of violating due process. (*Id*. at p. 436.) We thus turn to defendant's contention that the evidence was not relevant.

During direct examination, Burks cried after she described what happened when she returned to the garage after discussing the evening events with her friend Black. Asked why she did not call the police, Burks explained that she was more concerned about herself getting in trouble for giving alcohol to an underage person. When asked

15

what happened when she returned to the garage, Burks replied, "I go inside the garage, . . . and I see [Ragan] on the bed -- thank you -- and [defendant] is wrapped around her, like his arms and his leg, all around her. I take his arms and his leg off of her, and I get her in the same way that I was . . . carrying her before, . . . and I take her out." The prosecutor then asked Burks why she was crying. After the trial court overruled the relevance objection, Burks testified, "Because the whole situation is bad, and I just wish that I would have handled it differently, and that if I could just go back in time and just redo it, I would have stayed with her, or I wouldn't have went at all."

"We review a trial court's ruling excluding evidence on grounds of irrelevance (Evid. Code, § 350) for abuse of discretion. "'"The trial court has broad discretion in determining the relevance of evidence [citations] but lacks discretion to admit irrelevant evidence.'"' [Citation.]" (*People v. Thornton* (2007) 41 Cal.4th 391, 444.) We may not disturb the trial court's ruling on the admissibility of evidence "'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.) "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "'The test of relevance is whether the evidence tends "'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive. [Citations.]" [Citations.]'" (*People v. Heard* (2003) 31 Cal.4th 946, 973.)

Citing these rules, but omitting any reference to the credibility of witnesses, defendant suggests that the test for relevance is *limited* to establishing identity, intent, or motive. Assuming that we have correctly understood defendant's reasoning, he then implies that this test means that the only facts which are of consequence to the determination of the action are those relating directly to guilt or innocence, and that Burks's reason for crying failed the test for relevance because it had "no evidentiary value on the issue of [defendant's] guilt or innocence."

16

Of course, identity, intent, and motive are not the only facts which relate to guilt. Burks gave an eyewitness account of the defendant's criminal act, certainly a fact relating to his guilt, and undeniably of consequence to the determination of the action. Thus, her credibility was relevant. (See § 210.) Defendant does not contend that Burks's crying was irrelevant. Indeed, "a witness's 'demeanor is always relevant to credibility.' [Citations.]" (*People v. Scott* (2011) 52 Cal.4th 452, 493; Evid. Code, § 780, subd. (a).) Moreover, "[i]n determining the credibility of a witness, the jury may consider *any matter that has a tendency in reason to prove or disprove the truthfulness of his testimony* at the hearing, including but not limited to: a witness's character for honesty or veracity or their opposites; the existence or nonexistence of a bias, interest, or other motive; *his attitude toward the action in which he testifies or toward the giving of testimony*; and his admission of untruthfulness. (Evid. Code, § 780.)" (*People v. Harris* (2005) 37 Cal.4th 310, 337, italics added.)

Burks left her drunk and unresponsive 20-year-old friend with a man she suspected of raping her friend. Burks could have called the police and she could have enlisted the help of Black, but she did not. Such circumstances suggested that she did not really believe that Ragan was so intoxicated as to be incapable of giving legal consent to sexual intercourse with defendant. As respondent argues, whether Burks was crying from guilt due to falsely testifying or guilt for leaving a friend she knew had been assaulted, would bear on her credibility. It was, in any event, neither arbitrary, capricious, nor patently absurd for the trial court to so conclude.

Moreover, defendant suffered no prejudice. Burks gave conflicting testimony regarding her reasons for leaving Ragan with defendant: fear of defendant; fear that Black would get hurt; concern for her career; and uncertainty whether the sex was consensual. Burks's reason for crying did not clarify the conflicts, but merely explained that in hindsight, she knew she should have behaved differently. There was nothing in that explanation that eroded the defense theory that Ragan gave consent or that defendant subjectively believed Ragan was capable of giving consent.

17

Regardless, even if Burks's explanation could be construed as eroding a defense of actual consent or belief in actual consent, there would be no prejudice, as actual consent is not a defense to rape as defined by section 261, subdivision (a)(3). (*Giardino*, *supra*, 82 Cal.App.4th at p. 471.) There was ample evidence that defendant knew or reasonably should have known that Ragan was too intoxicated to give legal consent; and as our discussion in the previous section demonstrates, the evidence that defendant did in fact know of Ragan's condition was overwhelming. Under such circumstances, if the trial court had erred, we would conclude beyond a reasonable doubt that any such error was harmless under any standard.

## III. Witness support person

Defendant contends the judgment must be reversed because the trial court did not strictly comply with all the provisions of section 868.5.

Section 868.5, subdivision (a), provides that in cases involving a violation of section 261, the prosecuting witness shall be entitled to the attendance of up to two support persons of her choosing during her trial testimony, one of whom may accompany her to the witness stand. Subdivision (b) provides in relevant part: "In all cases, the judge shall admonish the support person or persons to not prompt, sway, or influence the witness in any way. Nothing in this section shall preclude a court from exercising its discretion to remove a person from the courtroom whom it believes is prompting, swaying, or influencing the witness."

Ragan was accompanied by an employee of the district attorney's office whom the trial court identified as her support person. Defendant complains that "[n]o inquiry was made of Ragan to see if she wanted to have a support person, nor was there any record made that having a support person would be helpful." Defendant also complains that the trial court failed to admonish the support person to not prompt, sway, or influence the witness in any way. However, defendant did not complain to the trial court, did not object to the support person, and did not request a hearing on the matter.

We agree with respondent that the issue has been forfeited. A failure to object to the support person's presence at trial forfeits any claim of error resulting from this

18

procedure. (*People v. Stevens* (2009) 47 Cal.4th 625, 641.) Further, unless the defendant requests a hearing and determination, he may not challenge the necessity for a support person. (*People v. Lord* (1994) 30 Cal.App.4th 1718, 1722.)

Defendant contends that his counsel rendered constitutionally ineffective assistance by not preserving this issue for appeal. Defendant's contention is without merit.

The Sixth Amendment right to assistance of counsel includes the right to the effective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 686-674; see also Cal. Const., art. I, § 15.) "Generally, a conviction will not be reversed based on a claim of ineffective assistance of counsel unless the defendant establishes *both* of the following: (1) that counsel's representation fell below an objective standard of reasonableness; *and* (2) that there is a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to defendant would have resulted. [Citations.] If the defendant makes an insufficient showing on either one of these components, the ineffective assistance claim fails." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126.)

Defendant has failed to demonstrate either component. "'Tactical errors are generally not deemed reversible; and counsel's decisionmaking must be evaluated in the context of the available facts. [Citation.] To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . ." [Citation.]' [Citations.]" (*People v. Hart* (1999) 20 Cal.4th 546, 623-624.) Although defendant recites such law, his only argument appears to be the bare conclusion that there could be no satisfactory explanation because counsel's conduct was egregious and prejudicial.

It is not difficult to identify possible satisfactory explanations. Defense counsel probably knew that a determination whether a support person would be helpful is not required. (See *People v. Spence* (2012) 212 Cal.App.4th 478, 517.) Further, counsel could logically have assumed that it was unnecessary to admonish a support person

19

employed by the district attorney's office, as she was presumably familiar with the rules relating to her position. (See *id*. at p. 518.) Counsel also may have reasonably assumed from the presence of the support person that it was Ragan's choice that she be there. Counsel does not render ineffective assistance by failing to make futile or unmeritorious objections. (*People v. Price* (1991) 1 Cal.4th 324, 386-387.) Defendant has failed to meet his burden to show that counsel's representation fell below an objective standard of reasonableness.

Nor has defendant demonstrated prejudice. "'[P]rejudice must be affirmatively proved; the record must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." [Citations.]' [Citations.]" (*People v. Hart*, *supra*, 20 Cal.4th at p. 624, quoting *Strickland v. Washington*, *supra*, 466 U.S. at p. 694.)

Defendant admits that the record is devoid of any indication that the support person tried to influence Ragan or the jury. Instead, defendant provides a lengthy dissertation on the prejudicial effect of prosecuting criminal defendants in the name of "the People," compounded by referring to the defendant as "the defendant," and calling the victim by her first name only, combined with the effect of having an employee of the district attorney's office serve as a support person. Defendant argues that the employee could impart subtle reactions which might indicate to the jury that the employee's belief that the witness's testimony was favorable to the state, or her personal rejection of defense evidence.

The contention that prosecution in the name of the People is prejudicial or that it violates due process or other constitutional rights was rejected more than a decade ago in *People v. Black* (2003) 114 Cal.App.4th 830, 832-833, and since then, similar challenges have been summarily rejected by the California Supreme Court. (E.g., *People v. Whisenhunt* (2008) 44 Cal.4th 174, 223; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1068.) As defendant does not cite or attempt to distinguish these cases, we also summarily reject the contention. And we reject the assertion that referring to defendant

20

as the defendant, rather than by name, undermines the presumption of innocence by suggesting an obligation to defend himself.  Personalizing defendant in the instructions would be far more likely to impart the suggestion of defendant's guilt.  In any event, the jury was instructed at the outset of trial that a defendant in a criminal trial is presumed to be innocent until proven otherwise beyond a reasonable doubt.  "Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions.  [Citation.]"  (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

Finally, the required admonition refers to influencing the witness, not the jury. (See § 868.5, subd. (b).)  Moreover, the possibility that a support person could display subtle reactions is always a risk, whether or not the court has given the required admonition.  Defendant does not contend that this happened or that defense counsel brought any such reactions to the attention of the court, but merely argues that an employee of the district attorney *might* be more apt to give such subtle signs.  Defendant argues, in essence, not that he was prejudiced by counsel's failure to object to the absence of the admonition, but that he *might* have been prejudiced *if* the support person had reacted badly, and *if* counsel had then failed to object.  Defendant's speculation fails to demonstrate the reasonable probability of a different outcome had the admonition been given.

## IV.  Rape kit

Defendant contends that it was unduly inflammatory to refer to the evidence packet prepared by the sexual assault nurse during her forensic examination as a "rape kit," and that defense counsel rendered constitutionally ineffective assistance by failing to object to the term.  The record does not reveal why there was no objection to the term. Defendant has failed to demonstrate that there could be no legitimate tactical reason not to do so, and defendant has cited no authority that might support such an objection. Further, where, as here, defendant was charged with rape, and the term "rape" was a necessary part of the evidence, arguments, and instructions, it was not unduly inflammatory to use the term.

21

Finally, defendant argues that prejudice resulted from the use of the term, because without it, the jury might have otherwise have found that the sex was consensual.  As we have already discussed, actual consent is not a defense to rape by intoxication. (*Giardino*, *supra*, 82 Cal.App.4th at p. 471.)  Thus, defendant fails to demonstrate a reasonable probability that the result would have been different had the term not been used, and his claim that counsel was ineffective fails.  (See *People v. Hart*, *supra*, 20 Cal.4th at p. 624.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
                    CHAVEZ

We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
HOFFSTADT